Dennis THERIAULT, Plaintiff, Appellant,

v.

Richard M. FLYNN, Commissioner, New Hampshire Department of Safety, Defendant, Appellee.

No. 98–1420.

United States Court of Appeals, First Circuit.

Heard Sept. 19, 1998.

Decided Dec. 8, 1998.

Wiltrud R. Mott–Smith with whom Ronald K. Lospennato, was on brief, for appellant.

Martha A. Moore, Assistant Attorney General, with whom Philip T. McLaughlin, Attorney General,.was on brief, for appellee.

Before LIPEZ, Circuit Judge, and COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Plaintiff-appellant Dennis Theriault claims that the Commissioner of the New Hampshire Department of Safety ("the Commissioner") violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213, by requiring him to take a road test as a prerequisite to renewing his driver's license when such testing was not a mandatory part of the renewal procedure for all applicants. Theriault, who has cerebral palsy and uses a wheelchair, previously had obtained a license to operate a vehicle equipped with hand controls. He maintains that he was required to pass a new test solely because of his disability. The district court concluded that a licensing officer's decision to administer the road test, after observing Theriault's apparent inability to control his hand movements, did not constitute unlawful discrimination, and granted summary judgment for the Department. We affirm.

## I. Background

Our review of a district court's grant of summary judgment is plenary, see *American Airlines v. Cardoza–Rodriguez*, 133 F.3d 111, 116 (1st Cir.1998), and we must consider the facts in the light most favorable to the opposing party, plaintiff Theriault. *See id.* Summary judgment is appropriate only if there is no genuine issue of material fact, allowing the court to conclude that the Commissioner is entitled to judgment as a matter of law. *See id.;* Fed.R.Civ.P. 56(c). We

briefly outline the relevant facts with these standards in mind.

Theriault's cerebral palsy, among other symptoms, diminishes his ability to use his legs and causes involuntary hand movements. He uses a walker to travel short distances and a manual wheelchair or electric scooter for longer distances. He originally obtained a driver's license in 1987 after a road test in which he used a vehicle equipped with hand controls. Although road tests are not always part of the renewal process,[1] Theriault was asked to take a road test again when he first renewed his license in 1991; he was told that the test was necessary at that time because his original license had not been properly coded for the use of special equipment. He successfully completed the test and was issued a license stamped with the letter "C," which indicated the use of hand controls. In February 1995, Theriault applied to renew his license for the second time, triggering the events underlying this case. Because his ability to write is extremely limited as a result of his cerebral palsy, Theriault's father completed the application form for him. After submitting the form, Theriault was asked to take a road test again. No explanation was given at that time for the testing. He again successfully completed the driving evaluation and was issued the renewal license.

Theriault subsequently filed this lawsuit and alleged that requiring a road test "solely on the basis of his obvious disability, and without any substantiated information that he posed a particular risk to public safety," constituted discrimination in violation of the ADA.[2] In response, the Commissioner argued that the decision to require a road test did not reflect impermissible discrimination, but resulted instead from the licensing officer's judgment that Theriault's physical condition on the day he sought relicensing warranted assurance that he could safely drive a vehicle. In support of the decision to require

the road test, the Commissioner relied upon a New Hampshire Department of Safety regulation stating that applicants under age 75 may be required to take road tests as part of the renewal process

> if the director has any reason to believe the applicant may be a hazard to public safety if licensed to drive, such as but not limited to apparent psychological or physical impairment.

N.H.Code Admin. R. [Saf–C] 1003.27(b).

The district court concluded that the Commissioner did not discriminate against Theriault based on his disability and therefore did not violate the ADA in requiring Theriault to take a road test. The court explained its review of the undisputed facts as follows:

> [I]t is evident that defendant required plaintiff to perform a road test, not simply because he finds himself among that group of persons who suffer from cerebral palsy, but based upon his own manifested symptoms and apparent inability to control his hand movements on the day he sought relicensing, and the fact that he operates his automobile with hand controls. That is to say, defendant asked plaintiff to demonstrate his ability to safely operate his motor vehicle because the physical manifestations of his disability (at least on the day in question) reasonably suggested to defendant that, despite his prior ability to drive safely, plaintiff may have no longer been able to do so.

After an unsuccessful motion to alter judgment, Theriault appealed, claiming that the court improperly drew factual inferences favorable to the Commissioner and misapplied the ADA in concluding as a matter of law that the road testing did not constitute unlawful discrimination.

## II.  *Discussion*

The ADA is a federal civil rights statute designed to provide comprehensive protec-

---

1.  All drivers over age 75 are required to pass a road performance evaluation in order to renew their licenses. N.H.Code Admin. R. [Saf–C] 1003.27(c). Drivers under age 75 must do so only in certain circumstances. *Id.* at 1003.27(b). *See infra* at 47. Theriault was 25 when he applied for the renewal license in 1995.

2.  Theriault sought declaratory and injunctive relief establishing that the Commissioner had violated his rights under the ADA and barring the state from requiring persons with disabilities to take road tests as a prerequisite to license renewals in the absence of a substantiated safety risk.

tion for disabled individuals against discrimination based on their disabilities. *See Arnold v. United Parcel Serv.*, 136 F.3d 854, 861 (1st Cir.1998); *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 510 (1st Cir.1996); 42 U.S.C. § 12101(b)(1). Title II of the statute provides that no "qualified individual with a disability" shall, by reason of that disability, "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The protection afforded by the ADA is characterized as a guarantee of "meaningful access" to government benefits and programs, *see Alexander v. Choate*, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)[3]; *Wynne* v. *Tufts Univ. Sch. of Med.*, 932 F.2d 19, 24 (1st Cir.1991) (*en banc*), which broadly means that public entities must take reasonable steps to ensure that individuals with disabilities can take advantage of such public undertakings.

This aspect of the ADA is not directly at issue here, as it cannot reasonably be argued that Theriault was denied "meaningful access" to a government benefit or program. New Hampshire does not foreclose individuals with cerebral palsy, or those who use wheelchairs, or even those whose hands uncontrollably shake, from driving, although their licenses may be restricted to operating vehicles with appropriate modifications. *See* N.H.Rev.Stat. Ann. §§ 263:6, 13.[4] Indeed, Theriault had been a licensed driver for eight years before the application process at issue, and his license was renewed, with minimal delay, following the challenged road test.

Theriault's claim centers instead on the method used to determine access to the government benefit, and his contention is that the extra eligibility requirement imposed upon him—the road test—constituted discrimination based on his disability.[5] Federal regulations explicitly forbid public entities from "administer[ing] a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability." *See* 28 C.F.R. § 35.130(b)(6). In the context of licensing or certification, a person is "qualified" and thus within the protected category if he or she can meet the "essential eligibility requirements" for receiving a license or certification, with accommodation made for the disability. *See* 42 U.S.C. § 12131(2); 28 C.F.R. pt. 35, app. A, at 472 (1997); *Applicants v. Texas State Bd. of Law*, 1994 WL 923404, at *6 (W.D.Tex. Oct. 11, 1994).

In determining whether "essential eligibility requirements" are met, a public entity properly may consider whether an applicant with a disability poses a direct threat to the health and safety of others. *See* 28 C.F.R. pt. 35, app. A, at 472–73 (1997); *id.* at § 36.208(c). *See also Bragdon v. Abbott*, —— U.S. ——, ——, 118 S.Ct. 2196, 2210, 141 L.Ed.2d 540 (1998) (involving Title III of the ADA) (noting the need to balance the interests of individuals with disabilities against legitimate concerns for public safety); *School Board of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (involving the Rehabilitation Act) (relied on in *Bragdon*). According to regulation, this judgment may not be based on generalizations or stereotypes about the effects of a particular disability, but must result from "an individualized assessment, based on reasonable judgment that relies on current medical evidence or on the best avail-

---

3. *Choate* involved interpretation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which outlawed discrimination against individuals with disabilities by public entities receiving federal financial assistance. Title II of the ADA was expressly modeled after Section 504 of the Rehabilitation Act, and is to be interpreted consistently with that provision. *See* 42 U.S.C. §§ 12133, 12201(a); *see also Bragdon v. Abbott*, —— U.S. ——, ——, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998); *Arnold v. United Parcel Serv.*, 136 F.3d 854, 861 n. 6 (1st Cir.1998); *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir.1996).

4. Subsection 6, *inter alia*, provides that "[n]o physical defect of an applicant shall debar him from receiving a license unless it can be shown by common experience that such defect incapacitates him from safely driving a motor vehicle, except as provided in [subsection 13]." Subsection 13 specifies licensing restrictions that may be imposed "to assure the safe driving of a motor vehicle by the licensee."

5. It is undisputed that Theriault is an "individual with a disability" within the meaning of the ADA and that the New Hampshire Department of Safety is a "public entity" subject to the obligations of the statute.

able objective evidence." 28 C.F.R. § 36.208(c); *see Arline*, 480 U.S. at 287, 107 S.Ct. 1123.

At this juncture, there is no dispute that Theriault, having demonstrated his ability to drive safely by means of the road test, meets the "essential eligibility requirements" for obtaining a New Hampshire driver's license. The issue is whether the Commissioner violated the ADA in making that determination by requiring Theriault to take the third road test. Theriault maintains that his condition had not changed, and perhaps even had improved, since he previously had renewed his license, and he emphasizes that he had never had an accident during his eight years of driving. In Theriault's view, therefore, his eligibility for a driver's license already had been established, and asking him to requalify with a road test when nondisabled individuals are not similarly reviewed constitutes discrimination in the administration of the driver's license program in violation of the ADA.

If this were, in fact, a case in which an additional eligibility requirement had been imposed on an applicant simply because he is disabled, a violation of the ADA in all likelihood would have occurred. *See Clark v. Virginia Bd. of Bar Examiners*, 880 F.Supp. 430, 442 (E.D.Va.1995) (finding discrimination based on disability where question on bar application "imposes an additional burden on applicants with [mental] disabilities to satisfy additional eligibility criteria"). There is no evidence, however, that Theriault was singled out simply because he is a disabled individual or because he has cerebral palsy. The record reflects, without dispute, that Theriault had limited use of his hands (so much so that he was unable to complete the application), and that the license he carried reported that he operated his vehicle with hand controls. We agree with the district court that asking him to demonstrate that his

present condition did not interfere with his safe driving ability—in other words, asking him to demonstrate that he remained qualified to drive—was not only permissible but also the state's obligation in balancing the rights of the disabled with the responsibility to ensure safety on the roads.[6]

Theriault argues that the Commissioner could have—and should have—met that obligation in a way that did not have a disparate impact on individuals with disabilities, either by administering road tests to all renewal applicants or by soliciting information from all applicants and their motor vehicle records about driving history or conditions that might affect their driving. The expense of hiring enough licensing officials to conduct the thousands of tests that would be required to satisfy the first of these suggestions strikes us as facially unreasonable, and even Theriault does not press this position. Relying on file information about driving history, on the other hand, does not speak to an individual's *present* ability to drive safely. Moreover, while requesting information directly from applicants might help identify additional individuals who should be given road tests, such interviews would not render road tests irrelevant or improper for applicants with observable limitations directly relevant to driving ability.

In the face of a licensing officer's judgment, based on direct observation, that an applicant has a condition that could impact his or her ability to drive safely, we think the Commissioner may reject reliance on an applicant's statement that the condition at issue has not changed materially since his or her license originally was issued or last renewed. Unless invasive probing of truthfulness were to burden the application process, the results of self-serving statements would be a shaky basis for license issuance. Moreover, even

---

6. Theriault claims that the licensing officer's motivation in requiring a road test is a question of fact that is not resolved by the present record, which, he claims, does not even demonstrate which of two possible licensing officials was involved. Absent some evidence indicating that discrimination based on his disability animated the official, we think it sufficient for purposes of summary judgment that the record contains objective evidence that, beyond dispute, warrants a reasonable concern for safety, *i.e.*,Theriault's limited use of his hands on the day in question in the face of his use of hand controls to drive. Although, as the district court acknowledged, the Commissioner's case could have been strengthened with an affidavit from the licensing examiner stating the basis for his decision, we consider the record adequate to support summary judgment.

50

assuming candid responses from applicants, such changes presumably can be small and, while insignificant to the applicant, properly may prove a basis for concern to an official whose responsibility extends not only to the applicant before him but also to all other drivers on the road. The Commissioner cannot be faulted for erring on the side of caution when safety is at issue, providing, of course, that the triggering judgment is based not on stereotypes but on observable, relevant circumstances.

Theriault does not, in fact, argue that the limitations in the use of his hands are an inappropriate basis for concern in a driver who operates a motor vehicle with hand controls. His argument is that he previously had met this concern. We do not discount the inconvenience of multiple road tests and take to heart Theriault's assertion that it is demeaning to be asked repeatedly to prove his ability to drive. The ADA, however, does not protect disabled individuals from all differences in treatment stemming from their disabilities, and it certainly does not require licensing officials to refrain from evaluating safety risks *because* an applicant appears to be disabled. To the contrary, when the safety of the public at large is implicated, public entities must be permitted some latitude in their judgments that individualized assessments of qualifications are necessary. *See generally Strathie v. Department of Transp.,* 716 F.2d 227, 231 (3d Cir.1983) (program administrators entitled to "some measure of deference" in determining reasonableness of a refusal to accommodate an individual with a disability) (cited in *Wynne,* 932 F.2d at 25). In our view, the Commissioner's use of a relatively non-burdensome procedure, properly based on criteria tailored to the ability to drive safely, was a lawful method for determining whether Theriault remained a qualified driver and thus was entitled to a license.[7]

We recognize that, in so holding, we effectively are saying that it is not "discrimination" within the meaning of the ADA to rely on the symptoms or appearance of a disability to single out a person for an individualized assessment. Although the concurrence offers a thoughtful differing view, *see infra* at 54, we believe our approach is consistent with the Supreme Court's ruling in *Arline,* 480 U.S. at 273, 107 S.Ct. 1123, which rejected a school board's attempt to justify its discharge of a teacher by claiming that its decision was based on the contagiousness of her tuberculosis as distinguished from the disease itself. The school's rationale was found lacking because there had been no individualized inquiry into the actual risks of infection posed by the teacher's own illness, and thus no consideration of whether she was qualified to teach despite her illness. She was fired simply because she had tuberculosis and because tuberculosis generally is contagious.

Thus, what is impermissible under *Arline* is rejecting an applicant automatically as a result of his disease or its symptoms, without considering the individual's abilities. When, however, symptoms concededly and objectively raise a concern about qualifications—such as significant hand movements in an applicant for a driver's license who operates his vehicle with hand controls—the public entity properly may engage in an individualized inquiry into whether the person is nonetheless qualified without shouldering the burden of defending its "discrimination" as "necessary." *See* 28 C.F.R. § 35.130(b)(8). Indeed, we believe this is why the ADA prohibits discrimination against *qualified* individuals with disabilities. No cognizable discrimination takes place when an objectively appropriate qualifying assessment is required. A different case would be presented, of course, if the state's criteria for qualification were assertedly discriminatory. That is not the case here; the safe-driving standard is accepted as appropriate.

7. In so concluding, we effectively also dispose of Theriault's related contention that the regulation upon which the Commissioner relied, N.H.Code Admin. R. [Saf.-C] 1103.27(b), *see supra* at 47, is facially violative of the ADA. The regulation's listing of "psychological or physical impairment[s]" as bases for a belief that "the applicant may be a hazard to public safety" does not authorize road testing of every individual manifesting such conditions but merely recognizes that such limitations are among the factors that could lead to a road test if—as in this case—they raise a question about the applicant's driving ability.

Moreover, it is important to note that the triggering criteria here are not limited to conditions of disability. The touchstone is observed apparent hazard; the regulation authorizes further inquiry if there is "any reason" to believe the applicant may pose a risk to public safety. Although apparent psychological or physical impairment are specifically listed, the category covers any condition that might impair one's ability to drive, whether based on alcohol, drugs, or emotional, physical or other factors. This is not a situation in which disabled individuals are singled out for less favorable treatment based only on the fact that they are disabled. In our view, the ADA permits a public entity to consider the symptoms or appearance of a disability at this threshold stage without activating the burden to defend discrimination.

Putting to one side whether our judgment is correct that no violation of the ADA took place as a matter of law, Theriault alternatively argues that summary judgment was premature because the record contained no information about the connection between his hand movements and the mechanics of the hand controls in his car. We reject the suggestion that the licensing official needed to ascertain the precise way in which Theriault's hand controls worked or the range of his hand movements before requiring the road test. The question faced by the licensing official was whether, given the apparent physical condition of the applicant before him and the license restriction, he could safely operate his vehicle. Whether a road test was a proper method for resolving that concern turns on those undisputed facts alone.

Theriault also suggests that the procedure used here was not an "individualized assessment" of his eligibility for a driver's license, as required by statute, because the details surrounding his driving record were not examined. In our view, the requirements were fully met. It was the individual factors of Theriault's license restriction and the apparent limitations in the use of his hands—not his status as a disabled individual or an individual with cerebral palsy—that made further inquiry into his driving ability reasonable. The ensuing road test unquestionably was an individualized assessment of his safe driving skills. *Cf., e.g., Ward v. Skinner*, 943 F.2d 157, 164 (1st Cir.1991) (upholding denial of waiver from general rule disqualifying individuals with history of epilepsy from driving commercial vehicles); *Stillwell v. Kansas City, Mo., Bd. of Police Comm'rs*, 872 F.Supp. 682, 683 (W.D.Mo.1995) (invalidating automatic disqualification of one-handed applicants for licensing as armed security guards). The fact that other information about his driving ability could have been considered does not render the procedures followed inadequate.[8]

### III. *Conclusion*

To sum up briefly, we conclude that the road test administered to Theriault was a mechanism to determine whether he remained qualified, not a licensing requirement imposed as a barrier to his participation in a government program. The record does not support an inference that Theriault was asked to take the test simply because he is disabled or suffers from cerebral palsy; his apparent physical condition on the day of the test presented a legitimate basis for concern about his ability to safely operate his motor vehicle. The ADA does not bar such qualifying assessments. It is, in fact, a public entity's responsibility first to determine whether a disabled individual is qualified and then to assure that such qualified individuals are given meaningful access to public programs and activities. We believe that, on this record, a factfinder would have to conclude that the Commissioner fulfilled these responsibilities.

We therefore affirm the district court's summary judgment that the Commissioner did not violate the ADA.

*Affirmed.*

LIPEZ, *Circuit Judge,* (concurring).

I agree with the majority that New Hampshire has a right to require that each driver

---

8. Theriault suggests that the district court erroneously applied the analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court, however, gave little attention to that framework, and it was at best an alternative ruling. We decline to delve into *McDonnell Douglas;* our discussion makes it clear that Theriault failed to articulate a viable claim of discrimination based on disability in violation of the ADA.

licensed by the state meets the essential eligibility requirement of being able to drive safely. I also agree that there is no violation of the ADA in the Commissioner's requirement that Theriault, as part of the license renewal process, perform a road test in order to establish that he still meets that essential eligibility requirement. The majority says there is no violation because requiring Theriault to take a road test to gain the renewal of his license was not discrimination within the meaning of the ADA. I conclude that there was no violation because requiring Theriault to take a road test, though discriminatory within the meaning of the ADA, was permissible discrimination under the Act. I believe those divergent routes reflect important differences in the application of the ADA, and I therefore write separately.

### I.

This case involves a challenge to New Hampshire's method of administering its driver's license renewal program. In my view, that program discriminates on the basis of disability as the term "disability" is defined in the ADA: "The term 'disability' means, with respect to an individual—(A) a *physical or mental impairment* that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (emphasis added). Pursuant to the New Hampshire Department of Safety regulation, an applicant can be required to take a road test to renew his or her driver's license

> if the director has any reason to believe the applicant may be a hazard to public safety if licensed to drive, such as but not limited to apparent *psychological or physical impairment.*

N.H.Code Admin. R. [Saf–C] 1003.27(b) (emphasis added). This regulation clearly distinguishes between those who have an apparent disability, described as an apparent psychological or physical impairment, and those who do not. The requirement that Theriault take a road test because of his

apparent disability was discriminatory within the meaning of the ADA.[9]

### II.

In concluding that the New Hampshire regulation does not "discriminate" on the basis of disability as that term is used in the ADA, the majority focuses primarily on "meaningful access" to government services and programs. Inasmuch as Theriault received a driver's license renewal, the majority is correct in recognizing that one of the goals of the ADA has been vindicated. However, this focus on access does not permit adequate review of the process through which the government determines qualifications for a program. That process may be as discriminatory as the ultimate determination of eligibility itself. Yet the majority seems to say that it is only once all the qualification judgments have been made, and the entitlement to access established, that the disabled can claim that there is discrimination within the meaning of the ADA if access to the program is denied.

The majority cites the ADA's prohibition of discrimination against "qualified" individuals to support its conclusion that different treatment of a disabled individual during a "threshold inquiry" into qualifications is not discrimination within the meaning of the ADA. So long as some reasonable, objective basis for questioning an applicant's qualifications is present, there is no discrimination. Thus, in the qualifications context, the majority reads an "invidiousness" or "irrationality" element into the statutory definition of "discrimination."

I think that is too narrow a view of the ADA, one purpose of which is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101. Congress did not premise the ADA on "reasonable" assumptions about people with disabilities. The ADA establishes a framework for scrutinizing all government regulations that discriminate on the basis of disability, not just unreasonable ones. In

**9.** Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability ... be subjected to discrimination by any [public] entity." 42 U.S.C. § 12132.

enacting the ADA, one of Congress' targets was society's basic assumption that it is reasonable to link "disabled" with "not qualified." Congress recognized the inherent unfairness embodied in such assumptions:

> The discriminatory nature of policies and practices that exclude and segregate disabled people has been obscured by the unchallenged equation of disability with incapacity and by the gloss of "good intentions." The innate biological and physical "inferiority" of disabled people is considered self-evident. This "self-evident" proposition has served to justify the exclusion and segregation of disabled people from all aspects of life.

S.Rep. 101–116, at 16 (1989); H.R. Rep. 101–485, at 41 (1990) (quoting testimony of Arlene Meyerson), *reprinted in* 1990 U.S.C.C.A.N. 267, 323. Congress was of course concerned with ensuring that qualified individuals with disabilities be given opportunities commensurate with their real abilities. But Congress also took cognizance of the discrimination experienced by the disabled during the process of gaining access to opportunity and sought to limit such discrimination. The stigmatic effects of such discrimination are very real, leading Congress to conclude that "[d]iscrimination produces fear and reluctance to participate on the part of people with disabilities." S. Rep. 101–116, at 16 (1989); H.R. Rep. 101–485, at 42 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 324. That is why additional administrative requirements applied only to those with an apparent disability are subjected to the more searching inquiry of necessity rather than mere reasonableness. *See* 28 C.F.R. § 35.130(b)(7) (discussed below).

New Hampshire's regulation classifies people on the basis of apparent disability rather than on their actual ability to drive safely. Simply put, New Hampshire discriminates against the entire class of disabled persons—qualified and not qualified alike—to ensure that no driver's license is issued to a disabled person who cannot drive safely (and, thus, is not qualified). New Hampshire's regulation discriminates against *both* qualified and nonqualified individuals with disabilities by singling out disabled individuals *as a group* for separate treatment. It is the use of disability as a proxy for "presumptively not qualified" that works the discrimination of which Theriault complains.

Assuming non-disabled individuals are qualified while assuming disabled individuals are not is generally inconsistent with the ADA. A similar proscription from Title I of the ADA [10] helps to inform this understanding. The ADA explicitly forbids discrimination "in regard to job application procedures" and specifies that the term "discriminate" includes "limiting, segregating, or classifying a job applicant in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant." 42 U.S.C. § 12112. In Title I language very similar to the Title II regulation (28 C.F.R. Part 35) under which we review New Hampshire's driver's license renewal program, the ADA prohibits the utilization of "standards, criteria, or methods of administration ... that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112(b)(3). Methods of administration which assume that non-disabled individuals are more likely to be qualified than disabled individuals "have the effect of discriminating on the basis of disability," even if they have intuitive appeal as reasonable.

The majority further concludes that New Hampshire's program does not discriminate on the basis of disability because the road test requirement was based on the symptoms of a disability (Theriault's limited use of his hands) rather than the disability itself (cerebral palsy). The majority disassociates Theriault's disability from the symptoms of that disability, stating that "[t]here is no evidence ... that Theriault was singled out because he is a disabled individual." Instead, he was asked to take the road test

---

10. Title II, which prohibits disability-based discrimination by public entities, speaks in more general terms than Title I (employment) and Title III (public accommodations). However, Congress clearly did not intend to give public entities more latitude than private parties to discriminate against the disabled. *See* H.R. Rep. 101–485, at 84 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 367 ("The Committee intends [ ] that the forms of discrimination prohibited by [Title II] be identical to those set out in the applicable provisions of titles I and III of [the ADA].").

because of "his physical condition on the day of the test." I question the validity of this distinction. Theriault was singled out for a road test because he has a disability which always manifests itself in the limited use of his hands. He is disabled because he has these symptoms.

I think *School Board of Nassau County, Fla. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), does not support the majority's distinction between a response to the symptoms of a disability and the disability itself. In *Arline*, the school board sought to shield its treatment of a teacher with tuberculosis from review under Section 504 of the Rehabilitation Act of 1973.[11] *Id.* at 276, 107 S.Ct. 1123. The school board argued that its treatment of Arline was not based on her tuberculosis as such, but on her contagiousness. *Id.* at 281–82, 107 S.Ct. 1123. The Supreme Court rejected this reasoning, opining that "[i]t would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." *Id.* at 282, 107 S.Ct. 1123. *A fortiori*, if the law does not recognize a distinction between a disability and its possible effect on others (i.e., contagiousness), the law does not recognize a distinction between a disease and its effect on the afflicted individual himself. As the Supreme Court recognized,

> Congress extended coverage . . . to those individuals who are simply "regarded as having" a physical or mental impairment. The Senate Report provides as an example of a person who would be covered under this subsection "a person with some kind of visible physical impairment which in fact does not substantially limit that person's functioning."

*Id.* (quoting S. Rep. 93–1297, at 64). Theriault is just such an individual: he has a visible physical impairment which in fact does not substantially limit him from functioning as a driver. Nonetheless, Theriault was treated differently because of his visible physical impairment, which is exactly what Congress sought to address through the ADA.

### III.

Recognizing that discrimination is taking place is critical because it shifts the burden to the government to justify the discrimination. Thus, a policy or practice that discriminates on the basis of disability in the administration of a governmental program cannot be defended on the basis that the policy is reasonable. The ADA sets a higher standard for justifying governmental discrimination on the basis of disability: in the present context, the government must show that the discrimination itself is "necessary" to the licensing scheme, or that modification would work a "fundamental alteration" in the program. *See* 28 C.F.R. § 35.130(b)(7) & (8); *see also Clark v. Virginia Bd. of Bar Examiners*, 880 F.Supp. 430, 442–43 (E.D.Va.1995) (holding that under Title II of the ADA, when an "additional burden discriminates against those with disabilities . . . the [public entity] must show that [the additional burden] is necessary to the performance of its licensing function").

This affirmative burden on the government to justify the discrimination is inconsistent with some of the district court's reasoning in denying Theriault's claim and demands further explication. After finding that Theriault had failed to articulate a prima facie case of unlawful discrimination, the district court provided an alternative ground for its decision by doing a *McDonnell Douglas*[12] analysis. The court held that the Commissioner had advanced a "legitimate non-discriminatory basis" for requiring the road test and that Theriault had "failed to produce any evidence that would reasonably support a finding of discriminatory animus on defendant's part." Because the majority agrees with the district court that no discrimination under the ADA had been established, it declines to comment on the propriety of this alternative holding. Because I find that the regulation does dis-

---

**11.** As noted by the majority, Title II was modeled after Section 504 and is to be interpreted consistently with that provision.

**12.** *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

criminate, but nevertheless withstands ADA scrutiny, a discussion of the appropriate legal framework is in order.

The *McDonnell Douglas* analysis is inapposite when examining a regulation for compliance with Title II of the ADA. *McDonnell Douglas* established a process for inferring discriminatory intent when direct evidence of such intent is lacking. *See McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817. However, in a facial challenge to a regulation under Title II of the ADA the intent of the public entity that promulgated the regulation is not at issue. Title II prohibits public entities from acting in a way which has the effect of discriminating on the basis of disability, whether the public entity intended to discriminate or not. *See* 28 C.F.R. § 35.130(b)(3) (prohibiting public entities from administering programs or criteria that "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" pursuant to Title II of the ADA); *see also Tyler v. City of Manhattan*, 118 F.3d 1400, 1407 (10th Cir.1997)("In enacting the ADA, Congress recognized that discrimination against the disabled is often the product of indifference rather than animosity."). In interpreting Section 504 of the Rehabilitation Act, the Supreme Court stated that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by discriminatory intent." *Alexander v. Choate*, 469 U.S. 287, 296–97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). Therefore, *McDonnell Douglas* burden shifting is unnecessary in this context; intent need not be found. Once Theriault showed that the challenged regulation discriminated among applicants on the basis of disability, the burden should have shifted to the Commissioner to justify the regulation as necessary to protect public safety.

Not all disability-based discrimination is prohibited by the ADA. Indeed, where, as in the present context, important public safety concerns are present, some discrimination may be permissible. *See e.g.,* 28 C.F.R. Pt. 35, App. A, at 477 (1997)(in establishing safety standards for licensees "the public entity must ensure that standards that it promulgates do not discriminate against ... qualified individuals with disabilities *in an impermissible manner*")(emphasis added). The inquiry turns then on whether the New Hampshire regulation impermissibly discriminates.

The ADA regulations require public agencies to eliminate policies, practices, and procedures which discriminate on the basis of disability "unless the public entity can demonstrate that making [ ] modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The regulations go on to prohibit eligibility criteria that have the effect of discriminating against disabled individuals "unless such criteria can be shown to be necessary[.]" 28 C.F.R. § 35.130(b)(8); *see also* 28 C.F.R. Pt. 35, App. A, at 478 (1997)(citing driver's license requirements as a context where policies which tend to screen out disabled individuals can be justified by safety concerns). The ability to require a road test is necessary if the Commissioner is to adequately protect public safety. The ADA does not require a state to forgo testing and rely solely on a license renewal applicant's representations of driving ability. Nor does the ADA demand that a state require every renewal applicant take a road test in order to legitimize more selective testing. Such a drastic change would "fundamentally alter" the program as that term is used in 28 C.F.R. § 35.130(b)(7) and is therefore not required by the ADA. As the majority points out, the state must be given some leeway in balancing public safety concerns with the ADA's anti-discrimination mandate. The regulation at issue here appropriately charts that course. Because the Commissioner has affirmatively met the burden required to justify discrimination under the ADA, I concur.