# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2023

Lyle W. Cayce
Clerk

No. 21-30709

Carolyn Clark,

*Plaintiff—Appellant*,

*versus*

State of Louisiana, Department of Public Safety ;
Corrections, Public Safety Services Office of Motor
Vehicles; James M. LeBlanc, Secretary, Department of
Public Safety and Corrections, in his official capacity
as Secretary,

*Defendants—Appellees*.

Appeal from the United States District Court
For the Middle District of Louisiana
USDC No. 3:20-CV-11

Before Richman, *Chief Judge*, and Ho and Engelhardt, *Circuit Judges*.

Per Curiam:

Appellant Carolyn Clark suffers from a condition which causes her to faint from positional changes, particularly in hot weather. Because of her condition, Clark sometimes utilizes a wheelchair. She was doing so in September 2019 when she went to her local Office of Motor Vehicles (OMV) to have her address changed on her driver's license. Because Clark was in a

No. 21-30709

wheelchair, OMV employees asked that Clark have her doctor fill out the entirety of a short medical form regarding possible conditions related to her ability to drive. Clark took offense at being asked to fill out the form, and sued. The district court dismissed Clark's claim at the summary judgment stage. Finding no error, we affirm.

## I

Appellant Carolyn Clark is a Louisiana citizen who suffers from a disability called postural orthostatic tachycardia syndrome, or "POTS." As Clark describes it, POTS is "a disorder of the autonomic nervous system," which affects blood flow and "leads to fainting" when Clark has a "positional change" such as "laying down, sitting up, sitting, and standing." Clark's symptoms are exacerbated in hot weather. Clark was initially diagnosed with POTS in 2016 when she moved to Louisiana. Because of her condition, Clark frequently uses a wheelchair.

Clark obtained a Louisiana driver's license in 2016 when she moved to the state. In September 2019, Clark went to the OMV to obtain a new license after an address change. Clark was using her wheelchair. An OMV employee inquired about Clark's wheelchair, and specifically asked Clark if she had "hand controls." Clark, interpreting the employee to be asking whether she had dexterity in her hands, responded that she did have hand controls.[1] The employee then provided Clark with a medical condition form. The employee told Clark to have her doctor fill out the form. In a section labeled "REMARKS (must indicate which sections are required to be filled out by the physician and the reason the form is being issued)" the OMV

---

[1] As Clark recognizes, the OMV employee was almost certainly referring to steering hand controls to operate a motor vehicle, which is a potential license restriction that may be applied under OMV Policy 13.00.

employee wrote "Customer is in a wheel chair."

The form asks medical questions on multiple topics. Some of these questions directly related to Clark's POTS, such as "Does patient have any medical or physical disorders?" or "Does patient have dizziness?" Other questions were not directly relevant to POTS, including "Does patient have a history of diabetes?" The form states "NOTE TO APPLICANT: This medical examination form must be completed by your physician and returned to this office within 30 days from the 'DATE ISSUED' indicated below. Failure to comply will result in the suspension of your driving privileges." The form also advises the physician, among other things, "NOTE TO PHYSICIAN: . . . This form must be completed in its entirety by the physician and must reference any illness in the History section as well as why this form was issued. Incomplete forms may be rejected and could result in the denial of this applicant's driving privileges."

Clark was issued the form pursuant to OMV Policy 1.23.00. That policy states that "[w]hen the Department suspects a physical or mental infirmity or disability that would constitute grounds for refusal of a driver's license, the Department may conduct an investigation to determine whether the driving privileges should be suspended or denied." In the "procedure" section, the policy continues, "[a]t the discretion of the [OMV employee], a Medical/Vision Form (DPSMV2015) may be requested before issuance of a license." The policy requires that "[t]he medical examination form must have all sections that apply to the driver's condition completed in its entirety and address the medical concern(s) for which it was required." The policy also suggests, in contrast to the language on the form, that "the only portion that must be completed is the section regarding the applicant's condition in question. If it's mental then the other sections do not need to be completed, etc."

No. 21-30709

Clark expressed outrage at being asked to fill out the form. She testified that she "was absolutely in shock at what the questions were" and that the request she fill out the form was "the most blatant discrimination I've ever seen in my life." Clark later returned to the OMV with her boyfriend. At this point, Clark spoke with an employee who told Clark that "it's our policy to give [the form] to everybody with a wheelchair, crutches, or a cane." Clark asked the employee to "specify what part of the form [she] actually had to fill out" and the employee responded, "all of it." At this point, Clark objected, saying that "this doesn't make any sense" and "why would you even ask these questions" because "a lot of those questions are things that you couldn't even visibly see about somebody." Clark admits that "it was just kind of an argument and then it ended." She then, by her own characterization, "stormed out."

Clark filed a complaint with the State Inspector General's Office, which responded that it had received the complaint and would look into it. Clark also attempted to get into contact with the OMV medical unit, but only got in touch the day she returned to the OMV with a completed form, and did not receive help from the medical unit.

Despite her misgivings, Clark had her doctor fill out the medical examination form. The completed form was filled out in its entirety, noted Clark's POTS diagnosis, wheelchair use, and dizziness, and stated the physician's opinion that it was safe for Clark to drive. After turning in the form, Clark was issued a renewed license.

Clark later sued the State of Louisiana, the Department of Public Safety and Corrections, the Office of Motor Vehicles, and Secretary James LeBlanc, in his official capacity as Secretary of the Department of Public

4

No. 21-30709

Safety and Corrections.[2] In her amended complaint, Clark claimed that OMV violated the ADA and the Rehabilitation Act by (1) determining that she required additional screening before renewing her license solely because she was in a wheelchair and (2) failing to offer her a reasonable accommodation. The State moved for summary judgment on Clark's claims, and the district court granted the motion. Clark appeals.

## II

This court reviews a grant of a motion for summary judgment de novo, and applies the same standard as the district court, viewing the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Courts do not disfavor summary judgment, but, rather, look upon it as an important process through which parties can obtain a 'just, speedy and inexpensive determination of every action.'" *Goldring v. United States*, 15 F.4th 639, 644 (5th Cir. 2021) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). A party that asserts that there is a genuine dispute as to any material fact must support its assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

## III

Clark's claims arise under Title II of the ADA and Section 504 of the Rehabilitation Act. "The ADA is a broad mandate of comprehensive

---

[2] For ease of reference, we collectively refer to the defendants in this matter as "the State."

character and sweeping purpose intended to eliminate discrimination against disabled individuals and to integrate them into the economic and social mainstream of American life." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (citation and quotation marks omitted). The focus of Title II of the ADA is the provision of public services. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, Section 504 of the Rehabilitation Act prohibits disability discrimination by recipients of federal funding. Section 504 provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The ADA and Rehabilitation Act generally are interpreted *in pari materia*." *Frame*, 657 F.3d at 223. Accordingly, although we focus on Title II of the ADA, the analysis applies to both statutes.[3] *Id.* at 223–24.

Clark first claims that the OMV violated the ADA and Rehabilitation Act by "commit[ing] disparate-treatment discrimination because it treats wheelchair users less favorably on the basis of their disability." Generally, "[t]o establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity;

---

[3] The two statutes do have different causation requirements, though that distinction is not at issue here. *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 n.1 (5th Cir. 2020).

and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004).

The parties cite various regulations which they agree govern Clark's claims. The most pertinent of these regulations provides, "A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities. However, the public entity must ensure that its safety requirements are based on actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 35.130(h). On these facts, this regulation is dispositive.[4]

To the extent that Clark argues that she was subjected to disparate treatment because she experienced individualized questioning due to her wheelchair use, that claim plainly fails. Ascertaining that an individual with an apparent disability is capable of driving before issuing a license is a legitimate safety requirement. Indeed, in an analogous case where a plaintiff challenged nearly identical requirements, we held that Louisiana's additional screening for those with a disability was "not motivated, even in part, by its desire to discriminate" but rather "by a desire to protect the public on the state's highways." *Coolbaugh v. Louisiana ex rel. La. Dep't of Pub. Safety & Corr. ex rel. La. Dep't of Motor Vehicles*, 136 F.3d 430, 439 (5th Cir. 1998). At

---

[4] Other cases have focused on different regulations, also cited by the parties. For example, in *Theriault v. Flynn*, 162 F.3d 46 (1st Cir. 1998), our sister circuit held that asking a man with cerebral palsy, who was shaking when he filled out paperwork for his driver's license, to undergo a driving test before issuing the license, was not "discrimination" within the meaning of the ADA, so the court need not consider whether such discrimination was "necessary" within the meaning of another regulation, 28 C.F.R. § 35.130(b)(8). We reach a similar result here, though we find it more straightforward to resolve the issue in the instant case under § 35.130(h).

No. 21-30709

oral argument, counsel for Clark recognized it was legal for OMV employees to inquire into her ability to drive.

Moreover, Clark admitted at oral argument that further inquiry into Clark's ability to drive based on wheelchair use was not based on "mere speculation, stereotypes, or generalizations" about people in wheelchairs. Counsel for Clark conceded that "of course, people who have wheelchairs, are in the run of cases, going to have certain conditions that may affect their ability to drive." And Clark's opening brief acknowledged that "[m]any wheelchair users will, of course, have conditions that affect their ability to drive." These concessions doom her disparate-treatment claim.

To the extent that Clark's gripe is not that she was singled out for additional screening based on her wheelchair use, but rather the extent of the questioning she was subject to, that claim is opaquely briefed.[5] But at any rate, it also fails. It is not incumbent on OMV employees—who have no medical training—to specify which portions of a short medical form that a person displaying a disability must fill out. Further, the fact that some of the questions on the brief medical form did not directly relate to Clark's personal disability does not delegitimize what we have already recognized as a legitimate safety requirement. The policy the State has put in place here is sufficiently narrowly-tailored to ensure safety on the roads without putting an undue burden on the State or the applicant. *Cf. Theriault v. Flynn*, 162 F.3d 46, 50 (1st Cir. 1998) (emphasizing that the use of a "relatively non-burdensome procedure, properly based on criteria tailored to the ability to drive safely, was a lawful method" for determining whether to issue a

---

[5] The thrust of Clark's argument in her opening brief regarding disparate treatment focuses on the fact that Clark was asked to fill out the medical form at all simply because she was in a wheelchair.

license).

Clark also evokes a parade of horribles, arguing that were the Court to rule in the State's favor, "there would be no limit on the amount of information the OMV could demand of wheelchair users," and the wheelchair-bound may soon find themselves subject to a "blood-oxygen test" or a "neurological evaluation." Not so. Our holding today—that asking Clark to have her physician fill out a less-than-three-page form related to conditions that may affect driving is a "legitimate safety requirement necessary for the safe operation" of a government service—addresses only the narrow facts before us in this appeal, and stands for nothing broader.

Clark also brings a claim which she characterizes as a reasonable accommodation claim.[6] In her briefing, Clark asserts that the State failed to provide her a reasonable accommodation by not allowing her to complete only the portions of the form she reviewed as pertinent to her disability and ability to drive. "[O]ur cases recognize that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II." *Windham v. Harris Cnty.*, 875 F.3d 229, 235 (5th Cir. 2017). "Title II 'does not require States to compromise their essential eligibility criteria for public programs'—'it requires only reasonable modifications,' and 'only when the individual seeking modification is otherwise eligible for the service.'" *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 618 (5th Cir. 2020) (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004) (alteration omitted)). Again, regulations inform the analysis here. They provide, "A public entity shall

---

[6] Title II uses the term "reasonable modification" rather than "reasonable accommodation." These terms create identical standards and are used interchangeably. *See McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004). In keeping with the language of the district court and much of the briefing, we use the term "accommodation."

make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).

As an initial matter, Clark's claim does not fit well within our ADA case law. Reasonable accommodations are generally designed to avoid effects that stem directly from one's disability. Put another way, the OMV was not failing to accommodate the "known limitations" of Clark, because her disability did not prevent her from filling out the form. *Windham*, 875 F.3d at 235. As such, it is outside of Title II's requirement that a public entity "make reasonable modifications . . . to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i). Rather, Clark's "reasonable accommodation" request is really a request that the State lessen the purported disparate treatment Clark faced from the requirement she fill out the entire form. Accordingly, it is a mirror image of the disparate treatment we rejected above and can be rejected on the same grounds.[7]

Further, the record doesn't make clear that Clark requested a "reasonable" accommodation at all. Generally, the burden is on the disabled individual to request an accommodation. *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007). The only record evidence describing Clark's request is her deposition and her one-page affidavit. In her deposition, Clark testified that she asked an OMV employee to "specify what part of the form [she] needed to fill out," and in her affidavit, Clark testified only that she "asked not to complete the entirety of the form or have the form

---

[7] Moreover, it is difficult to see what burden Clark suffers from answering the additional questions she objects to. Clark would have already had to go to her doctor and pay a co-pay for him to fill out the portions of the form directly related to her POTS condition. And though Clark objects to the State keeping her sensitive medical information on its servers because they could theoretically be hacked in the future, that purported harm is far too speculative.

redacted." Contrary to Clark's representations on appeal, the record does not demonstrate that Clark actually requested to only fill out the portions of the form related to the condition that caused her wheelchair use, or that she explained her condition to the OMV employee and asked to fill out the form limited only to a certain section related to her condition. Rather, the record only shows that Clark requested that the OMV employee unilaterally narrow what portions of the form Clark's physician must fill out, which is an unreasonable request given that there is no evidence that the OMV employee (who lacked medical training) had any knowledge of Clark's POTS.[8]

Finally, Clark's intentional discrimination claim rises or falls with her other claims. Having found that the State's request that Clark have her physician fill out the medical form did not violate the ADA via disparate treatment or failure to accommodate, we similarly find as a matter of law that the State did not act with "something more than deliberate indifference" toward Clark's disability. *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 575 (5th Cir. 2018).

As one of our sister circuits has noted, "[t]he ADA . . . does not protect disabled individuals from all differences in treatment stemming from their disabilities, and it certainly does not require licensing officials to refrain from evaluating safety risks *because* an applicant appears to be disabled. To the contrary, when the safety of the public at large is implicated, public

---

[8] Clark also faults the State for failing to engage in an "interactive process" to consider her purported accommodation request. But we have held that when "responsibility for the breakdown of the informal, interactive process" is traceable to the requester, no liability exists for failure to accommodate. *See Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011). The record provides good reason to think that Clark is responsible for the breakdown of any interactive process here. After describing the State's explanation for asking her to fill out the form as "bullshit or whatever," Clark readily admitted in her deposition that "it was just sort of an argument and then it ended" and that she "left the form there and stormed out."

No. 21-30709

entities must be permitted some latitude in their judgments that individualized assessments of qualifications are necessary." *Theriault*, 162 F.3d at 50. We agree. The scope of the ADA is broad, but it is not so broad as to encompass Clark's claims here, where she was asked to endure a minimal—at most—burden to ensure safety on the public roadways.

## IV

For the foregoing reasons, we AFFIRM the judgment of the district court.