# United States Court of Appeals
## For the First Circuit

No. 12-1392

MARY BETH RUSKAI,

Petitioner,

v.

JOHN S. PISTOLE, Administrator,
Transportation Security Administration,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE TRANSPORTATION SECURITY ADMINISTRATION

Before

Lynch, Chief Judge,
Lipez and Kayatta, Circuit Judges.

Inga S. Bernstein, with whom Monica R. Shah, Naomi R. Shatz, and Zalkind Duncan & Bernstein LLP were on brief, for petitioner.
Sydney Foster, Attorney, U.S. Department of Justice Civil Division, with whom Stuart F. Delery, Assistant Attorney General, Mark B. Stern, and Sharon Swingle were on brief, for respondent.

December 23, 2014

**KAYATTA, Circuit Judge**. As someone with a metallic joint replacement, Mary Beth Ruskai cannot pass through some security checkpoints in U.S. airports under current Transportation Security Administration ("TSA") security protocols without submitting to a standard pat-down that includes security officials touching areas around her groin and breasts to look for concealed metallic and nonmetallic weapons. Having unsuccessfully petitioned TSA to change its protocols, she asks this court to find that they violate the Fourth Amendment and federal disability discrimination law, and to set them aside. For the reasons that follow, we cannot so find.

## I. Background

TSA is part of the U.S. Department of Homeland Security ("DHS"). 6 U.S.C. § 203(2). Congress created TSA in response to the events of September 11, 2001, "and charged it with ensuring civil aviation security, including the screening of all passengers and property that move through U.S. airports." Redfern v. Napolitano, 727 F.3d 77, 80 (1st Cir. 2013); see also 49 U.S.C. § 114(d); Field v. Napolitano, 663 F.3d 505, 508 (1st Cir. 2011). One of TSA's principal jobs is to keep passengers from boarding a plane with explosives, weapons, or other destructive substances (hereafter, "weapons"). 49 U.S.C. § 44901.

There are roughly 500 commercial airports in the United States that each serve over 2,500 passengers per year, with most larger airports having multiple terminals and, often, multiple

screening lines within terminals.  See Fed. Aviation Admin., Report to Congress: National Plan of Integrated Airport Systems (NPIAS) 2013-2017, at 4, available at http://www.faa.gov/airports/planning_capacity/npias/reports/historical/media/2013/npias2013Narrative.pdf.  With more than 600 million passengers of all sorts carrying myriad items flying into and out of these airports each year, see Passengers, Bureau of Transp. Statistics, http://www.transtats.bts.gov/Data_Elements.aspx?Data=1, TSA's job is a challenging and ever-evolving task.

Planes blown out of the sky in Russia and attempted bombings on U.S. airliners in recent years have warned TSA that its screening procedures must be capable of detecting both metallic and nonmetallic weapons.  See 78 Fed. Reg. 18,287 - 18,291 (March 26, 2013).  As anyone who frequently flies knows, TSA's primary strategy for coping with this challenge has been to develop and use technology: specifically, walk-through Advanced Imaging Technology scanners ("AIT scanners") that can detect both metallic and nonmetallic weapons on clothed passengers.  Implementation of this strategy remains a work in progress.  In the fall of 2010, TSA revised one of its Standard Operating Procedures ("SOPs"), called the Screening Checkpoint SOP, to include additional procedures aimed at detecting nonmetallic weapons.  The new SOP authorized the use of two types of AIT scanners as the primary methods of

screening at U.S. airports[1], and adopted as a secondary screen a new "standard pat-down," which is an enhanced form of the previously used pat-down. Redfern, 727 F.3d at 80. The primary protocol requires anyone wanting to fly to go through an AIT scanner or to submit to the new standard pat-down. Id.

The rollout of the new technology as the primary screening method encountered significant resistance. The AIT scanners were viewed by many as generating, in effect, a nude picture of each passenger, many of whom were not inclined to pose for such pictures as a price of flying. See, e.g., id. TSA worked to develop privacy software (known as Automated Target Recognition, or "ATR") for the AIT scanners, such that no screening agent had to personally examine AIT images for weapons. Congress weighed in as well, passing the FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 826, 126 Stat. 11, 132, requiring TSA to ensure that all passenger-screening AIT scanners employed ATR by June 2012 (later extended to May 2013). Redfern, 727 F.3d at 81.

TSA has continued to expand its use of AIT scanners. Its efforts were set back when the manufacturer of one of the two types of AIT scanners TSA had initially deployed, the so-called backscatter scanner, was evidently unable to develop adequate ATR

---

[1] TSA had begun using some AIT scanners as secondary screening tools for selected passengers at some airports in 2007. Redfern, 727 F.3d at 80.

-4-

capability, so backscatter scanners have been removed from airport operation. Id. Nevertheless, the government asserts in its brief that TSA "has deployed more than 740 AIT machines at almost 160 airports and anticipates deploying approximately 80 additional machines by 2015." Even so, there remain many screening points that yet lack AIT scanners, or where they are not in use full-time. Ruskai's challenge in this case concerns TSA's protocol for those checkpoints.

The primary screening device at checkpoints lacking AIT scanners is the walk-through metal detector ("WTMD"). In other words, at those checkpoints, TSA effectively does not screen most passengers' bodies for nonmetallic weapons, and will not do so until AIT scanners are installed. Suffice it to say, TSA credibly claims to be intent on reducing the number of such checkpoints.

There are several groups of passengers for whom TSA relies on screening techniques other than (or in addition to) the WTMD and AIT scanners, including people who cannot medically go through an AIT scanner or WTMD, who alarm either primary screening machine, or who are randomly selected for additional screening. Many of those people are subject to the standard pat-down, which Ruskai describes as involving a TSA agent touching around her breasts, feeling inside her waistband, and running a hand up the inside of each thigh until reaching the groin. Others (including children, the elderly, individuals selected for random additional

screening, and those screened by opposite-gender TSA personnel) receive a modified, more limited, version of the standard pat-down.

Additionally, TSA has opted to impose more limited screening burdens on passengers whom it confirms are part of TSA's PreCheck program. As described in the briefing, PreCheck offers passenger members "expedited screening in designated lanes if they have been cleared for such screening based on certain background checks conducted prior to their arrival at the airport[,]" and a more limited pat-down in the event that the passenger alarms a WTMD.

Ruskai, whose job requires her to fly frequently, has had three joints replaced, and at least one of her replacement joints is metal. As such, she triggers an alert when she walks through a WTMD. If, while traveling, she proceeds through a PreCheck screening lane, Ruskai, who is a PreCheck member, is supposed to receive the more limited pat-down following her unsuccessful pass through the WTMD. As discussed at greater length below, the government now also claims that Ruskai may receive the more limited pat-down, even in non-PreCheck lanes, if a boarding pass scanner confirms her PreCheck status. (Ruskai disputes how limited these "limited" pat-downs really are.) But if the checkpoint has no PreCheck lane, or cannot verify Ruskai's PreCheck status, Ruskai is subject to the standard pat-down. She objects to this procedure, finding it "stressful," "invasive," and "extremely unpleasant."

-6-

While many people may have less sensitivity to the indignities of the search, certainly Ruskai is not unusual in finding it invasive and disturbing, as has been made very clear to TSA at, among other things, congressional hearings.

Ruskai's principal argument is, simply stated, as follows: since the only reason she requires a follow-up search is that she trips the WTMD, TSA should search her only for metal, and it should conduct such a metal-only search using a hand-held metal detector "wand" ("HHMD"), supplemented by inspection of her medical documentation of the implant and a pat-down of only the area to which the HHMD alerts. TSA's refusal to restrict its search in this manner, she claims, constitutes an unreasonable search under the Fourth Amendment, and violates section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

## II. Jurisdiction and Timeliness

We begin by confirming that we have jurisdiction to consider Ruskai's petition for review. Under 49 U.S.C. § 46110, with certain exceptions,

> a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to [certain] security duties and powers . . . .) in whole or in part under [Part A of subtitle VII of Title 49 of the U.S. Code] may apply for review of the order by filing a petition for review . . . in the court of appeals of the United States for the circuit in which the person resides . . . .

-7-

Neither party disputes that TSA's security protocol and refusal to grant Ruskai's requested accommodation constitute a final order reviewable by this court. We agree. See Blitz v. Napolitano, 700 F.3d 733, 739-40 (4th Cir. 2012). Cf. Gilmore v. Gonzales, 435 F.3d 1125, 1133 (9th Cir. 2006) (TSA security directive is a reviewable "order"); Aviators for Safe & Fairer Regulation, Inc. v. F.A.A., 221 F.3d 222, 225 (1st Cir. 2000) (noting that the term "order" is read "expansively" in section 46110).

A petition for review "must be filed not later than 60 days after the order is issued[;]" late petitions are permitted "only if there are reasonable grounds for not filing by the 60th day." 49 U.S.C. § 46110(a). The final TSA letter denying Ruskai's request was dated January 19, 2012, but postmarked February 3. She filed for review on April 2--more than 60 days after the letter was written, but less than 60 days after it was sent. We asked the parties to brief whether Ruskai's petition was timely. They agree that it was, and so do we. See, e.g., Avia Dynamics, Inc. v. F.A.A., 641 F.3d 515, 519 (D.C. Cir. 2011) (concluding that "issuing" means making a decision publicly available); Americopters, LLC v. F.A.A., 441 F.3d 726, 733 & n.5 (9th Cir. 2006).

## III. The Record

We turn next to the record, which for three reasons is somewhat unusual.

First, although this petition calls for review of an agency order, the order here was the result of informal agency action, not an administrative hearing or public notice and comment. Starting in early 2011, Ruskai submitted a series of complaints to TSA about being repeatedly subjected to pat-downs. She found TSA's responses inadequate, and eventually filed a complaint with DHS's Office for Civil Rights and Civil Liberties, claiming that the searches violated her Fourth Amendment rights and discriminated against her on account of her disability. Nearly nine months later, DHS declined to open an investigation and directed any further inquiries to TSA's Office of Disability Policy and Outreach. On January 19, 2012, a TSA "policy advisor" wrote to Ruskai, noting that TSA could not effectively investigate her claims at that late date, but nonetheless rejecting her request that she be offered modified security screening procedures. Following that denial, Ruskai filed a petition for review with this court. The parties have given the court an administrative record, which, it seems, was largely compiled by TSA based on its records at the time it rejected Ruskai's requests.

Second, much of the record is sealed, with some portions unavailable even to Ruskai's counsel. Most of that sealing is

because TSA exercised its authority to designate certain information Sensitive Security Information, and so limit its dissemination. See 49 C.F.R. pts. 15 and 1520.

Third, the underlying facts are not static, as TSA continues to pursue its goal of expanding its use of AIT scanners and its PreCheck program.

As a result of these factors, both parties have sought to supplement the record before this court.

## A. Ruskai's Motion to Supplement the Record

Before oral argument, Ruskai moved to supplement the administrative record by adding an affidavit about her screening experiences. Ruskai argues we should consider her statement because her side of the story is not well reflected in the current record only because TSA failed to investigate her initial complaints. Cf. Cousins v. Sec'y of the U.S. Dep't of Transp., 880 F.2d 603, 610 (1st Cir. 1989) (noting that APA review is normally limited to the administrative record, but petitioners are not prejudiced as they may contribute to the administrative record during the agency proceedings). The government declined to take a position on her request, and has waived any objection by affirmatively relying without objection on Ruskai's affidavit; accordingly, we grant the motion. Cf. WildWest Inst. v. Bull, 547 F.3d 1162, 1176 (9th Cir. 2008) (maintaining that a court may "consider extra-record materials (1) when necessary to determine

-10-

whether the agency considered all relevant factors in making its decision; (2) when the agency has relied on extra-record materials; (3) when necessary to explain technical terms or complex subject matter; or (4) when the agency has acted in bad faith"). Regarding Ruskai's brief, however, we note that simply because information is available on the internet, and cited in a brief, does not automatically render it either evidence or part of the administrative record.

**B.  The Government's Rule 28(j) Letter**

After oral argument, the government filed a citation of supplemental authority under Federal Rule of Appellate Procedure 28(j), informing us that TSA recently expanded the PreCheck program.  Essentially, the government claims that if a TSA official confirms (using technology used to scan boarding passes) that a passenger qualifies for TSA PreCheck for a given flight, they can receive PreCheck security treatment even in normal screening lanes. Ruskai objects both to the use of Rule 28(j) to introduce this new evidence and to the government's characterization of the information.

Rule 28(j) provides that "[i]f pertinent and significant authorities come to a party's attention . . . after oral argument but before decision . . . [the] party may promptly advise the circuit clerk by letter . . . setting forth the citations."  Fed. R. App. P. 28(j).  Generally, while 28(j) is not strictly limited

-11-

to offering authorities that did not exist at the time of briefing or oral argument, it should not be used to introduce new arguments or new evidence. United States v. Rodriguez-Lozada, 558 F.3d 29, 38 n.4 (1st Cir. 2009); 16AA Charles Alan Wright, Arthur R. Miller et al., Federal Practice and Procedure: Jurisdiction § 3974.6 (4th ed.).

We have sometimes acknowledged such factual submissions, however, at least where they raise a question of mootness. See, e.g., Redfern, 727 F.3d at 83 (where both parties agreed in substance to the facts in the government's Rule 28(j) letter, seeing "no difficulty" in taking judicial notice of those facts and finding the case moot); United States v. Brown, 631 F.3d 573, 580 (1st Cir. 2011) (considering mootness after the government informed the court by Rule 28(j) letter that defendant was out on supervised release). Cf. Pleasures of San Patricio, Inc. v. Mendez-Torres, 596 F.3d 1, 5 (1st Cir. 2010) (noting that the parties had not filed a Rule 28(j) letter on the status of related litigation, and so the court could not conclusively rule that the case before it was moot). Although the parties do not address mootness, we are obliged to consider the issue sua sponte. See Overseas Military Sales Corp., Ltd. v. Giralt-Armada, 503 F.3d 12, 16 (1st Cir. 2007). Insofar as Ruskai seeks to enjoin TSA's SOP as applied to her, any change in the protocol could materially impact her entitlement to relief. The new SOP does not, however, moot the

entire dispute, as it is unclear how many airports and individual checkpoints are affected by the revised policy.

In any event, the government has previously and consistently maintained that Ruskai's is a "shrinking problem," because TSA is trying both to expand the PreCheck program and to increase the number of passengers screened through AIT scanners, subject to resource and process constraints. This new information is merely consistent with those prior representations. Also, Ruskai does not challenge the bare fact that PreCheck is being expanded. We therefore accept the government's representation, though it itself is of little relevance to our review because the government has offered few details on implementation.

## C. Ruskai's Second Motion to Supplement

Ruskai more recently filed a second motion to supplement the record. In this second motion, she includes her own supplemental affidavit and the affidavit of an observer who witnessed her proceed through security. She asserts that, on six trips that she took since January 2014 (when oral argument was held in this case), she was in fact able to access PreCheck entry, but on four of those occasions (when AIT scanners were unavailable) she was still subjected to a pat-down that, she claims, was more invasive than previous PreCheck limited pat-downs she had received, and which made her "very uncomfortable." Accordingly, she now claims, "there is little distinction" between PreCheck limited pat-

downs and standard pat-downs. The government takes no position on this motion. We allow its filing, again while recognizing its limited relevance because the agency decision on review in this case includes no challenge by Ruskai to the limited pat-down used under the PreCheck program.

## IV. Standard of Review

In assessing Ruskai's challenge to TSA's security procedures, our review is limited to objections she raised before the agency, unless she can show "a reasonable ground for not making the objection" to TSA first. 49 U.S.C. § 46110(d). TSA's findings of fact are conclusive "if supported by substantial evidence." Id. § 46110(c). Because section 46110 does not specify a standard of review for non-factual determinations, the Administrative Procedures Act ("APA") fills that gap, such that we review questions of law de novo and set aside TSA's decision if it is "arbitrary and capricious." 5 U.S.C. § 706(1). Under that standard, we assess whether the "agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Penobscot Air Servs., Ltd. v. F.A.A., 164 F.3d 713, 719 (1st Cir. 1999) (internal quotation and alteration marks omitted). We also set aside an agency decision if it is "contrary to constitutional right, power, privilege or immunity" or "otherwise not in

accordance with law." 5 U.S.C. § 706 (1), (2). Ruskai's arguments to us predominantly invoke these latter tests. She asserts that the Screening Checkpoint SOP accords with neither the Fourth Amendment nor the Rehabilitation Act.

## V. Analysis

### A. Fourth Amendment

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. In most cases, reasonableness "requires a showing of probable cause," but that standard "is peculiarly related to criminal investigations and may be unsuited to determining the reasonableness of administrative searches where the Government seeks to prevent the development of hazardous conditions." Bd. of Educ. v. Earls, 536 U.S. 822, 828-29 (2002) (citations and internal quotation marks omitted); see also Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652-53 (1995) (warrantless searches may be justified by needs beyond ordinary law enforcement); Nat'l Treas. Emps. Union v. Von Raab, 489 U.S. 656, 667-68 (1989). The courts of appeals treat transit security screenings as "administrative" or "special needs" searches, which may be conducted, at least initially, without individualized suspicion, a warrant, or probable cause. See, e.g., Von Raab, 489 U.S. at 675 n.3; Elec. Privacy

<u>Info. Ctr.</u> v. <u>U.S. Dep't of Homeland Sec.</u>, 653 F.3d 1, 10 (D.C. Cir. 2011); <u>United States</u> v. <u>Aukai</u>, 497 F.3d 955, 959-60 (9th Cir. 2007) (en banc); <u>Cassidy</u> v. <u>Chertoff</u>, 471 F.3d 67, 74-75 (2d Cir. 2006)(Sotomayor, J.); <u>United States</u> v. <u>Hartwell</u>, 436 F.3d 174, 177 (3d Cir. 2006)(Alito, J.); <u>see also</u> <u>United States</u> v. <u>De Los Santos Ferrer</u>, 999 F.2d 7, 9 (1st Cir. 1993) (describing airport luggage searches as administrative searches).

In a Fourth Amendment challenge to a search like that at issue here,[2] we assess the search's reasonableness by balancing "the public interest in the [TSA's search] program against the privacy concerns implicated by the" search. <u>See</u> <u>Von Raab</u>, 489 U.S. at 679. Although different circuits have used variations on this test,[3] we focus on "the gravity of the public concerns," "the

_____

[2] The parties do not cross swords over whether the screening process is one search or several, and generally seem to treat it as one. We proceed accordingly. <u>Cf.</u> <u>Hartwell</u>, 436 F.3d at 177.

[3] <u>See</u>, <u>e.g.</u>, <u>Elec. Privacy Info. Ctr.</u>, 653 F.3d at 10 (weighing "on the one hand, the degree to which [a search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests"(quoting <u>United States</u> v. <u>Knights</u>, 534 U.S. 112, 118–19 (2001)); <u>MacWade</u> v. <u>Kelly</u>, 460 F.3d 260, 268-69 (2d Cir. 2006)(assessing property searches on the subway by weighing factors including "(1) the weight and immediacy of the government interest; (2) the nature of the privacy interest allegedly compromised by the search; (3) the character of the intrusion imposed by the search; and (4) the efficacy of the search in advancing the government interest" (citations and internal quotation marks omitted)); <u>Hartwell</u>, 436 F.3d at 178-79 (weighing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty" (citations and internal quotation marks omitted)); <u>United States</u> v. <u>Marquez</u>, 410 F.3d 612, 616 (9th Cir.

degree to which the [search] advances the public interest," and "the severity of the interference with individual liberty." Illinois v. Lidster, 540 U.S. 419, 427 (2004); see Hartwell, 436 F.3d at 178-79 (applying these considerations in the airport checkpoint context). While we will not require the government to adopt the least intrusive practicable alternative, there must be a fairly close fit between the weight of the government's interest in searching and the intrusiveness of the search--that is, the search must be a "reasonably effective means" for furthering the important government interest. See Earls, 536 U.S. at 837. With these principles in mind, we turn to the relevant facts in this case.

### 1. Ruskai's Privacy Interest and the Intrusiveness of the Search

Many of us have at some point found ourselves subject to a TSA pat-down--including the standard pat-down challenged here. Accepted as mildly annoying or uncomfortable for some, the standard pat-down is experienced as quite an intrusive indignity by many others, including petitioner Ruskai. The procedure she describes being subjected to has many similarities to the Supreme Court's description of a pat-down for weapons in Terry v. Ohio, 392 U.S. 1 (1968), involving an officer "feel[ing] with sensitive fingers

---

2005) amended 2005 WL 1661572 (9th Cir. July 18, 2005) (deeming an airport search reasonable "if: (1) it is no more extensive or intensive than necessary, in light of current technology, to detect weapons or explosives; (2) it is confined in good faith to that purpose; and (3) passengers may avoid the search by electing not to fly" (citations and internal quotation marks omitted)).

every portion of the prisoner's body . . . [including his] arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet." Id. at 17 n.13 (quoting L. L. Priar & T. F. Martin, Searching and Disarming Criminals, 45 J. Crim. L., Criminology & Police Sci. 481 (1954)).  The Court called the search "a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment" which "is not to be undertaken lightly." Id. at 17.  While Ruskai fairly relies on Terry to label the standard pat-down significantly intrusive, the comparison fits less closely than she claims.  Under TSA protocols, generally males search males and females search females; parts of the search are conducted with the back of the officer's hands rather than the palms or open fingers; privacy is offered; and the administrative nature of the search is much less accusatory, especially as members of the traveling public have become inured to the conduct of precautionary searches that rarely reveal any unlawful activity. Cf. Hartwell, 436 F.3d at 180.  We nevertheless certainly agree that the search is objectively intrusive, although not everyone will necessarily find it as objectionable as Ruskai does.

### 2.    The Nature of the Government's Interest

On the other side of the balance, the government retains two key interests implicated by Ruskai's challenge to its current protocol.

-18-

First, and most obviously, TSA asserts a critical interest in keeping both metallic and nonmetallic weapons off commercial flights. It observes that, in recent years, nonmetallic explosives have become one of the greatest threats to aviation security. 78 Fed. Reg. 18287-01, 18291 (March 26, 2013). For example, on December 22, 2001, a terrorist attempted to detonate a nonmetallic bomb concealed in his shoe. Id. In 2006, terrorists in the United Kingdom plotted to bring liquid explosives onto an aircraft where they would then construct and detonate a bomb while in flight. Id. Three years later, an Al Qaeda plot to blow up an American aircraft using a nonmetallic explosive device hidden in a suicide bomber's underwear was foiled. Id. Worldwide, attempted terrorist actions involving nonmetallic explosives have continued. Id.

Second, TSA takes as its relevant starting point the undisputed fact that, when a person triggers an alert at a WTMD, TSA needs to search them in some manner, certainly to look for the metal that triggered the alarm. Given that a search is required in such situations, TSA suggests that it has an interest in using a search protocol designed to identify both metallic and nonmetallic weapons--a protocol that it also uses at AIT checkpoints when a passenger declines to proceed through an AIT scanner. In adopting the new screening checkpoint SOP, TSA highlighted the benefits of streamlining its operations in a forward-looking manner that

-19-

focuses training and resources on the types of searches that it already uses to search for both metallic and nonmetallic weapons.

As a massive agency with roughly 60,000 employees and responsibility for security at over 450 airports, What is TSA?, Transp. Sec. Admin., http://www.tsa.gov/about-tsa/ideafactory (last visited Oct. 16, 2014), TSA has a significant interest in adopting protocols that can be uniformly and efficiently administered.[4]

### 3.    Balancing the Interests

Reduced to their essence, Ruskai's Fourth Amendment arguments largely hinge on four points:  (1) TSA must limit its search of Ruskai to a search for metallic weapons when she sets off a WTMD; (2) TSA has means of advancing its interests other than by patting down passengers who alarm a WTMD; (3) TSA cannot claim to have a substantial need to pat down passengers for nonmetallic weapons because it allows most passengers to board planes with just a WTMD search when AIT scanners are unavailable (and does not require pat-downs at foreign preclearance airports); and (4) the method TSA uses to determine who receives a standard pat-down is

---

[4]  Ruskai criticizes TSA's reliance, in adopting the revised protocols, on the idea that (largely) replacing HHMDs with standard pat-downs helps TSA keep its procedures "streamlined and effective," claiming that the efficiency rationale is unproven and "insufficient to warrant the repeated use of the [standard] pat-down on an extremely low-risk segment of the traveling public."  In our view, however, the efficiency and training advantages of aiming to reduce the number of different screening protocols, and focusing on those that will be of the most use in the future, are fairly obvious.

unreasonable.  We address these arguments in turn.

### a.    Scope of the Search

Ruskai reasons that because she is pulled out of line for a search only because her implants trigger the WTMD, TSA can search her only for metal, which it can do adequately using a HHMD. Otherwise, she claims, the search is not "reasonably related in scope" to the circumstances giving rise to it.  Terry, 392 U.S. at 20.  In support of this argument, she relies most heavily on the Second Circuit's opinion in United States v. Albarado, 495 F.2d 799 (2d Cir. 1974).  In that case, when the defendant was patted down after alarming a WTMD, officers uncovered a package of counterfeit bills wrapped in aluminum foil.  Id. at 802. The Second Circuit concluded that the defendant should have had an opportunity to divest himself of any metallic objects, be searched with a HHMD, or be subjected to some other similarly less-intrusive procedure to find the offending metal before he was patted down.  Id. at 807-10. That court insisted that a WTMD alarm does not afford a license to search for anything, though it did acknowledge that officers may sometimes investigate nonmetallic items, due to the risk of, e.g., plastic explosives.  Id.

Forty years of experience diminish any persuasive force we might have otherwise assigned to Albarado's Fourth Amendment analysis of airport searches.  Albarado rests on a presumption that the principal risk is metallic weapons, and thus implies that

searches for nonmetallic weapons must be limited to situations in which airport security otherwise "comes lawfully upon a container which may conceal such items," id. at 809, or more generally when "specific, articulable facts exist to support" a reasonable belief that a danger exists, id. at 810. Taken to its logical conclusion, those presumptions would mean that TSA could not search administratively for nonmetallic weapons without individualized suspicion, at least if there were no AIT technology available. We doubt that the Albarado court itself would so hold if it had the benefit of considering TSA's well-supported findings that nonmetallic weapons are now the principal threat.

More recent precedent recognizes the threat of "explosives in liquid or powder form." Elec. Privacy Info. Ctr., 653 F.3d at 10. The Eleventh Circuit recently observed: "Numerous . . . incidents of aviation terrorism have involved nonmetallic explosives." Corbett v. Transp. Sec. Admin., 767 F.3d 1171, 1180 (11th Cir. 2014). "Metal detectors cannot alert officers to nonmetallic explosives, and the United States enjoys flexibility in selecting from among reasonable alternatives for an administrative search." Id. at 1181.

Contrary to Ruskai's unsupported assertions, the fact that a WTMD alerts TSA to Ruskai's metallic implants does not mean that she is less likely to have a nonmetallic weapon (though the record is equivocal on whether it makes it any more likely,

-22-

either).  The WTMD alert thus does not, we conclude, limit the number or type of TSA's interests in conducting a search.  Instead, the WTMD alarm explains why Ruskai is one of the passengers whom TSA selects for a search sufficient to locate the principal weapons with which it is concerned.  Whether that selection criterion is a reasonable one we discuss at greater length below.

### b.    Alternative Means

Ruskai urges that we find TSA's standard pat-down policy unconstitutional because TSA could employ a less intrusive search that still furthers its legitimate interests.  Although Ruskai is correct that courts sometimes consider alternatives to the challenged search or seizure (as in Albarado, or, e.g., Blackburn v. Snow, 771 F.2d 556, 566 (1st Cir. 1985) (noting the existence of alternative adequate security measures in invalidating a blanket policy of strip searching prison visitors)), the alternatives' significance is circumscribed, as the "Supreme Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means to accomplish the government's ends."  Cassidy, 471 F.3d at 80 (internal quotation marks omitted).  In any event, we are not convinced that Ruskai has posited any truly workable alternative.

### i.    Modifications to PreCheck

Ruskai's first proposal is to modify TSA's PreCheck program.  She argues that even when a checkpoint lacks the

technology needed to confirm PreCheck status, she should be able to show TSA personnel medical records confirming she has an implant. But the security risks of requiring TSA to simply accept medical documentation as proof that Ruskai, or any other passenger, is not carrying a weapon are obvious. Moreover, Ruskai is already a PreCheck member, and did not clearly challenge the search protocol for PreCheck passengers in the administrative proceeding, or in her petition for review.[5] As PreCheck expands, her cause for complaint shrinks. And if a checkpoint is not able to confirm PreCheck status, it would seem obvious that it could not confirm the authenticity of whatever medical documents Ruskai might show.

Ultimately, the problem is that there is not yet PreCheck capability at all checkpoints where there are no AIT scanners. TSA, however, agrees with Ruskai that PreCheck should be more widely available. Indeed, the agency represents that its current

---

[5] At oral argument, Ruskai contended that the more limited PreCheck pat-down is also unacceptable, and continued that theme in her second motion to supplement the record. Her opening brief did not distinguish between the standard and PreCheck pat-downs, and so arguably encompassed both. However, in her reply brief, Ruskai cited the more limited PreCheck pat-down as being an alternative that is "more respectful of passengers' civil rights," and responded to the government's argument about the more limited PreCheck pat-down by asserting that "there is no reason why she should not be able to show the card at every security lane . . . and receive the same benefit that she would in a PreCheck lane." Accordingly, we consider her objection to the PreCheck limited pat-down raised for the first time at oral argument, and so forfeited. See Fed. R. App. P. 28(a); Piazza v. Aponte Roque, 909 F.2d 35, 37 (1st Cir. 1990)("Except in extraordinary circumstances not present here, a court of appeals will not consider an issue raised for the first time at oral argument.").

screening program calls for continuous expansion of its use of AIT scanners and PreCheck.  TSA's current use of both techniques and its ongoing efforts to expand their availability persuade us that it would make no sense to require TSA also to develop a system for, in effect, using medical documents in lieu of PreCheck.[6]

### ii.   Resuming Reliance on HHMDs

Ruskai suggests that TSA could simply use HHMDs (and perhaps a limited follow-up pat-down) to confirm that the only offending metal on her person is in her joints--just as it did prior to 2010.  In particular, she emphasizes that this must be a reasonable alternative, because it is the screening approach taken in several Canadian airports that the U.S. government has included in the preclearance program.

As to the foreign preclearance airports, the government contends that it has not yet fully completed the process of certifying that the Canadian airports to which petitioner refers provide a fully adequate level of security screening. (Of course, the government seems to allow passengers to fly into the United States after such screenings, and so must consider their procedures at least minimally adequate.) Regardless, foreign airports involve additional legal and political exigencies.  In our view, in deciding how to allocate its limited resources, TSA may reasonably

_____

[6] Of course, a different situation would be presented should TSA change its program by abandoning its efforts to expand the use of these tools.

-25-

choose not to require foreign airports to use all U.S. procedures without compromising as a constitutional matter its ability to require somewhat more stringent procedures domestically.

In any event, use of HHMDs is simply not an alternative means of finding nonmetallic weapons. Rather, in proposing this alternative, Ruskai is simply repeating her scope-of-search argument that TSA has no legitimate reason to search her for nonmetallic weapons. We have rejected that argument because TSA has reason to search every passenger for nonmetallic weapons.

### iii. Additional Suggested Modifications

As for the other modifications suggested by Ruskai, including her specific requested revisions to the pat-down protocol, we cannot address them at length without discussing sealed material. Suffice it to say that we have reviewed the record (public and otherwise) and are satisfied that Ruskai's requested changes to the protocol are not so obviously practicable and effective as to render unreasonable TSA's decision to reject them. In each instance, moreover, the modifications Ruskai proposes would undercut the efficiency and streamlining interests cited by TSA. "[T]he United States enjoys flexibility in selecting from among reasonable alternatives for an administrative search." Corbett, 767 F.3d at 1181. In Michigan Dep't of State Police v. Sitz, the Supreme Court explained that "Brown was not meant to transfer from politically accountable officials to the courts the

decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger," and that "for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources." 496 U.S. 444, 453-454 (1990); see also City of Ontario, Cal. v. Quon, 560 U.S. 746, 764 (2010) ("Even assuming there were ways that [the officers] could have performed the search that would have been less intrusive, it does not follow that the search as conducted was unreasonable."). Moreover, Ruskai admits that some of her proposed alternatives would not satisfy her own view of the Fourth Amendment standard.

In any event, this is not a case in which the government has two alternative methods of searching Ruskai for nonmetallic weapons, and simply opts for the more intrusive. The current state of affairs is that at many airport security checkpoints, TSA has no choice on how to search for nonmetallic weapons (when it chooses to do so--a point we address further below). It either uses a pat-down, or it does not search for nonmetallic weapons at all.

### c.  Effectiveness and Underinclusiveness

Ruskai contends that the government cannot prove that the new screening protocols are sufficiently effective even to warrant their adoption. She notes that the Fourth Amendment requires the

search to be calibrated to the relevant risk, and that TSA is required to use risk-informed evaluations of, and choices about, transportation security. See generally, e.g., 49 U.S.C. § 114(s). She maintains that TSA has not conducted sufficient studies to demonstrate the effectiveness of the new protocols--nor can it even collect the relevant data, because an individual alarming a WTMD will pass through to the sterile area of an airport after a "clean" pat-down, regardless of whether the underlying metal is found.

We acknowledge that there is not the same sort of effectiveness data in the record here as courts have examined in, e.g., sobriety checkpoint cases. Cf. Sitz, 496 U.S. at 453-55 (in considering the lawfulness of seizing cars at a sobriety checkpoint, emphasizing that "effectiveness" is part of the inquiry into "the degree to which [a] seizure advances the public interest," and describing as constitutional various checkpoints with detection rates of .5% - 1.6%). Although we cannot discuss it at length, there is more support in the record than that cited by Ruskai for the government's claim that it does examine the effectiveness of its security measures. (Moreover, an important function of the standard pat-downs--deterrence--is notoriously difficult to quantify. Cf. MacWade v. Kelly, 460 F.3d 260, 274-75 (2d Cir. 2006).) And as noted above, TSA is already taking steps to implement a more risk-informed screening protocol. Finally, Ruskai has adequately shown neither that section 114 is privately

enforceable nor why we should accept it as the relevant Fourth Amendment standard.

A variation on the effectiveness theme is Ruskai's argument that the screening SOP is, essentially, irrationally underinclusive, and so cannot be considered a reasonably effective tool for combating transit terrorism. If TSA were patting down most every passenger when AIT scanners are not available, the foregoing discussion would likely lead easily to the rejection of Ruskai's Fourth Amendment claim. TSA does not, however, pat down most passengers when AIT scanners are not available. To the contrary, most passengers who clear the WTMDs, which search only for metal, board airplanes without any further search of their person. The resulting and significant underinclusiveness of TSA's use of pat-downs raises two questions: Why does TSA not pat down most passengers at checkpoints lacking AIT scanners or PreCheck? And given that it does not, why does TSA pat down <u>any</u> passengers (e.g., Ruskai)? These questions capture the core of Ruskai's argument.

The answer to the first question appears to be that the prospect of patting down all or most passengers individually is like the prospect of stopping all cars on all roads at sobriety checkpoints: The scale of the operation generates collateral costs that are not present when a subset of travelers is searched. In an airport, that cost would naturally include a large expense in

-29-

manpower and much longer lines and delays.

As for the second, more difficult question, TSA has two reasons to search those passengers who trigger a WTMD alert for both metallic and nonmetallic weapons, even though it does not search passengers who do not trigger a WTMD alert for nonmetallic weapons. First, since it must search such passengers for metallic weapons anyway, searching them for nonmetallic weapons as well offers an incremental benefit with low incremental cost. Second, TSA has an efficiency interest in training its personnel in a limited number of techniques, and pat-downs are the primary alternative to AIT scanners.

Ruskai does not argue that no one should be screened by a standard pat-down. Rather, she says that the standard pat-down should only be employed when there exists a suspicion that the particular person to search may pose an atypical risk of having a nonmetallic weapon. In our view, in the context of administrative or special needs searches, the Supreme Court has not required the degree of precision tailoring advocated by Ruskai. Take, for example, Earls, 536 U.S. at 836-37. There, the Court rejected a Fourth Amendment challenge to a requirement that middle and high school students submit to a urine drug test in order to engage in extracurricular activities.[7] The Court rejected the argument that

---

[7] Although the Court noted that "[u]rination is an excretory function traditionally shielded by great privacy," the degree of intrusion on one's privacy involved in taking such a sample depends

such tests could only be given on individualized suspicion, or after the school demonstrated that there was a drug problem of some type among the group chosen to be tested. Id. Rather, it relied on the contention that "the safety interest furthered by drug testing is undoubtedly substantial for all children," and concluded that "testing students who participate in extracurricular activities is a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use," notwithstanding the suggestion that the policy may have been overinclusive. Id. at 836-38.

We acknowledge that Earls is not on all fours with this case--there, the Court specifically relied on the custodial responsibilities of a public school, and characterized the search as negligibly intrusive. Id. at 830, 833; cf. Hartwell, 436 F.3d at 178 n.7 (suggesting that the "special needs" search at issue in Earls was distinct from administrative searches at airports). We nonetheless find its guidance instructive, and note that while the search here is undoubtedly more intrusive, given the scale of the

_____

upon the collection procedures. Id. at 832 (internal quotation marks omitted). In that case, a "faculty monitor wait[ed] outside the closed restroom stall for the student to produce a sample and [had to] listen for the normal sounds of urination in order to guard against tampered specimens" and then sent the sample for testing. Id. (internal quotation marks omitted). This procedure, the Court concluded, constituted a "negligible" intrusion, and the invasion of students' privacy was "not significant." Id. at 833-34. But cf. id. at 841 (Breyer, J, concurring)(noting that not everyone might find the procedure negligibly intrusive).

-31-

risk, the safety interests at stake are also dramatically more acute.  Cf. MacWade, 460 F.3d at 269 (discussing Earls and noting that the Supreme Court "never has implied--much less . . . held--that a reduced privacy expectation is a sine qua non of special needs analysis" and so rejecting the proposition that a search of baggage on the subway is only permissible where the traveler has a diminished expectation of privacy).  Moreover, since the government "may deal with one part of a problem without addressing all of it," Erznoznik v. City of Jacksonville, 422 U.S. 205, 215 (1975), "[t]he Supreme Court has been skeptical of challenges to the constitutionality of searches under the Fourth Amendment that suggest that a security policy's randomness or insufficient thoroughness contributes to its constitutional deficiencies."  Cassidy, 471 F.3d at 86.

In sum, precedent teaches that a school can conduct administrative searches for drugs by requiring urine tests of fewer than all students who might be equally prone to use drugs, and police may conduct sobriety checkpoints on one road while not stopping drivers on most others.  So too, here, the fact that TSA searches only some passengers for nonmetallic weapons where it lacks an AIT scanner does not render the searches unconstitutional.  And this is particularly so where TSA has a reasonable explanation for why it searches for nonmetallic weapons on persons it must search anyhow.

Clearly, neither Congress nor TSA finds the current underinclusiveness in screening passengers for nonmetallic weapons to be acceptable in the long run--hence TSA's ongoing expansion of, among other things, AIT deployment. The cost being incurred to install AIT scanners, for example, makes concrete the very substantial weight assigned by Congress to the threat of nonmetallic explosives. And, as discussed above, even though pragmatic and efficiency considerations may outweigh (in TSA's judgment) its interest in screening every non-AIT-screened passenger for nonmetallic weapons, there is no dispute that TSA will have to conduct some follow-up search on individuals who cannot or do not pass through a WTMD without setting it off. TSA thus adequately explains the underinclusive nature of its use of standard pat-downs in a manner that does not belie the justifications cited for conducting the search.[8]

### d. Irrational and Unfair Selection

Of course, if the selection criteria for follow-up searches is invidious, then an otherwise reasonable search might

---

[8] Ruskai points out that TSA's interest in streamlining must not be too great because it does not use the standard pat-down on all occasions, such as when it pats down a PreChecked passenger. That TSA's pursuit of an interest has limits does not, however, mean that the interest is invalid or without weight. Specifically, the intent in streamlining is not belied by having two levels of pat-down searches, one for those with PreCheck clearance and one for those without such clearance. Adding a third option would, by definition, move TSA further away from its goal of reducing the number of search protocols.

indeed be susceptible to challenge.  We certainly do not reject the possibility that conducting an otherwise reasonable administrative search in an unlawfully discriminatory manner might violate the Fourth Amendment.  Cf. Wayne LaFave, 5 Search & Seizure § 10.6(b) (5th ed.) (in discussing profiling, suggesting that a screening "program involving some degree of nonrandom selectivity can pass Fourth Amendment muster only if the selection criteria tend to identify suspicious people," and noting that the "central considerations" for assessing non-random criteria should be whether (1) some selection criteria is necessary to avoid overwhelming the system and (2) "it reasonably appears that any other basis of selection is not likely to work at least as well" (citations and internal quotation marks omitted)); Brown v. City of Oneonta, 235 F.3d 769, 776 (2d Cir. 2000) (Walker, C.J., concurring in denial of rehearing en banc)(noting that Fourth Amendment doctrine in some ways protects against discriminatory enforcement).  After all, to constitute a valid administrative search, the government's search procedure must be a reasonable tool for furthering its interest. But Ruskai has not adequately presented a discrimination-focused argument as part of her Fourth Amendment claim.[9]  Accordingly, we

---

[9]  Certainly, Ruskai argued in her petition that TSA's policy is both overinclusive and underinclusive in that many are not fully searched, and individuals with implants are repeatedly patted down despite posing no objectively greater risk of terrorist activity. But a general overbreadth or underbreadth argument is not the same as a claim of invidious discrimination, and an overbreadth claim likewise fails under the rationale of Earls.

defer further consideration of this principle to the evaluation of her claim under the Rehabilitation Act, discussed below. Cf. Whren v. United States, 517 U.S. 806, 813 (1996) (emphasizing that, while the "Constitution prohibits selective enforcement of the law based on considerations such as race," the primary constitutional basis for that objection is the Equal Protection Clause[10]).

***

There is in this record admittedly some flavor of bureaucratic inertia. Given the pertinent threats, however, it seems that the inertia tends to result more in inadequate screenings than in excessive screenings. In this regard, it is remarkable that the administration and Congress have not yet managed to achieve full AIT capability, and continue to allow large numbers of passengers to board without any screening for nonmetallic weapons. At the same time, though, TSA is a large organization, and its task is daunting. Importantly, TSA itself clearly finds the current status quo unacceptable, and assures us that it is in the process of greatly reducing (though perhaps not entirely eliminating) the aspects of its current program that trouble Ruskai. Our review of how TSA conducts secondary searches during this transition requires, in turn, some deference to TSA's expertise regarding the nature of evolving threats, how people

---

[10] Ruskai does not make an Equal Protection or selective enforcement claim.

-35-

behave in airports, and the capabilities of TSA's workforce and systems. Within reason, choosing which technique best serves the government interest at stake should be left to those with a "unique understanding of, and responsibility for, limited public resources." Corbett, 767 F.3d at 1181 (quoting Sitz, 110 S. Ct. at 2487. And as the D.C. Circuit noted in assessing pre-ATR AIT scanners, the Supreme Court has refused to declare only the least intrusive practicable search reasonable under the Fourth Amendment, and constitutional precedent does not demand that a search be "minimally intrusive" in order to pass constitutional muster. Elec. Privacy Info. Ctr., 653 F.3d at 10-11; see also Cassidy, 471 F.3d at 80.[11]

In sum, we conclude that the Fourth Amendment does not prevent TSA from searching for both metallic and nonmetallic weapons on passengers who trigger WTMD alarms just as it does on passengers who decline to pass through AIT scanners. Accordingly, Ruskai's Fourth Amendment claim fails.

## B.   Rehabilitation Act

Ruskai's next claim is that TSA's security screening procedures discriminate against her in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Section 504(a) provides that no otherwise qualified individual with a disability

---

[11] We note, too, that TSA tested and rejected search techniques more intensive than the standard pat-down.

"shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" receiving federal funds. At issue is whether TSA procedures subject her to discrimination under the meaning of the Act.

Ruskai makes no claim that TSA discriminates against her intentionally in using the WTMD to select her as someone who must pass a secondary screening before entering beyond the security checkpoint. Nor could she. The WTMD is a facially neutral device aimed at detecting metal, not disabilities. Many disabled persons pass through it without triggering an alert. Many non-disabled persons trigger an alert. Ruskai relies, instead, on a theory of unintentional discrimination, which she describes as "disparate impact." She claims--and TSA does not seem to deny--that most persons who have a large metallic implant are selected by the WTMD for a secondary search, while most people who do not have such an implant are not selected. TSA also does not challenge Ruskai's claim that she has a disability within the meaning of the Act. And it presumes that many people with metallic implants are similarly viewed as disabled--not because the implant itself is a disability, but rather because they may have had a disabling condition for which the metal is a "mitigating measure." 29 C.F.R. § 1630.2(j)(1)(v).

In <u>Alexander</u> v. <u>Choate</u>, 469 U.S. 287 (1985), the Supreme

Court considered the question "whether proof of discriminatory animus is always required to establish a violation of section 504 and its implementing regulations, or whether federal law also reaches action by a recipient of federal funding that discriminates against the handicapped by effect rather than by design." Id. at 292. The Court "assume[d] without deciding that section 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped." Id. at 299. At the same time, it "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases under section 504." Id. The balance struck by the Court was to focus on whether the government action denied meaningful access to the government benefit at issue in the case. Id. at 301-02.

In the ensuing three decades, the Supreme Court has not revisited the issue of whether and when a section 504 claim can be maintained in the absence of discriminatory animus. We nevertheless think it well established that what the Court assumed to be so is so--proof of discriminatory animus is not always required in an action under section 504. See Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008) (noting that "a showing of discriminatory intent or animus is not required in cases alleging a failure to accommodate"); cf. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) ("Unlike other enumerated constructions of 'discriminate,' this construction does

not require that an employer's action be motivated by a discriminatory animus directed at the disability . . . . [A]n employer who knows of a disability yet fails to make reasonable accommodations violates the [ADA], no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business."). Indeed, DHS's own regulations plainly provide that "[t]he Department may not . . . utilize criteria or methods of administration the purpose or effect of which would: (I) subject qualified individuals with a disability to discrimination on the basis of disability." 6 C.F.R. § 15.30(b)(4). While acts of intentional discrimination certainly occur, and are actionable, see Sumes v. Andres, 938 F. Supp. 9, 12 (D.D.C. 1996) (medical provider's failure to treat patient solely because she was deaf constitutes discrimination under section 504), the disability laws often have as their target action--or inaction--that "is primarily the result of apathetic attitudes rather than affirmative animus." Alexander, 469 U.S. at 297. Thus, a classic claim that an architectural barrier denies a disabled person meaningful access to a public facility requires no proof of discriminatory animus. See Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 907-09 (6th Cir. 2004). Nor does it require the type of sophisticated statistical evidence typical of disparate impact claims in Title VII cases. Cf. Jones v. City of Boston, 752 F.3d 38, 48-53 (1st Cir. 2014) (describing the use of

statistical analysis to show disparate racial impact as evidence of employment discrimination).

When the Supreme Court assumed that a disparate impact theory could apply in an action under section 504 in some situations, the situation it identified was a case in which persons with disabilities were denied meaningful access to a government program or benefit. Alexander, 469 U.S. at 299. That exclusionary situation may fairly be described as the primary target of section 504. Id. at 297. The problem for Ruskai is that she can point to no government benefit, service, program, or facility to which TSA's challenged conduct denies her meaningful access. Her complaint trains only on those airport checkpoints that lack both AIT and PreCheck capabilities. Even at these WTMD-only checkpoints, she receives on each occasion full and complete access to the secure side of the security checkpoints. She also receives full and complete access to TSA's security screening program.

Additionally, Ruskai admits that TSA is certainly entitled to require all passengers to walk through a WTMD, and that it is entitled to conduct a secondary search of all who do not or cannot pass through the WTMD without triggering an alarm. That is, she does not challenge the selection device that inadvertently, by detecting metal, generates the subset of passengers we assume to include a disproportionate number of those who have disabilities. Crucially, she also concedes that the secondary search itself does

not affect a person differently merely because the person has a disability. In other words, the aspect of the secondary search to which she objects is an aspect to which she would equally object if she had no disability.

Ruskai points to no case law adopting the view that any government conduct that affects a group that includes a disproportionate number of persons with a disability (e.g., a group of Medicare recipients, or hospital patients, or retirement resort residents, etc.) must be free from any unpleasant effects, such as dollar impact, waiting time, or lack of quality, unless those effects are fundamental or necessary to the government's program. And it is precisely this type of effect--neither connected to any denial of access nor motivated by discriminatory intent--that Alexander treats as outside section 504's target. Alexander, 469 U.S. at 299, 301-02. Specifically, Alexander rejected "the boundless notion that all disparate-impact showings constitute prima facie cases under section 504." Id. at 299. The Court expressed the concern that because "the handicapped typically are not similarly situated to the nonhandicapped," straightforward application of disparate impact theory "could lead to a wholly unwieldy administrative and adjudicative burden." Id. at 298 (citing Note, Employment Discrimination Against the Handicapped and Section 504 of the Rehabilitation Act: An Essay on Legal Evasiveness, 97 Harv. L. Rev. 997, 1008 (1984)); see also Patton

-41-

v. <u>TIC United Corp.</u>, 77 F.3d 1235 (10th Cir. 1996) ("A facially neutral government restriction does not deny 'meaningful access' to the disabled simply because disabled persons are more likely to be affected by it.")  The "disparate impact" of which Ruskai complains appears to be just this type of effect deemed to be insufficient.

Ultimately, we need not rest our holding on the foregoing analysis, concerning which the case law is sparse.  Rather, Ruskai's argument on this appeal still fails even if we assume that one might maintain a section 504 claim for unintentional discrimination based on the imposition of a burden that does not result in a loss of meaningful access to a government benefit, service, program, or facility, and the effect of which is not enhanced by the disability.

Our decision in <u>Theriault</u> v. <u>Flynn</u>, 162 F.3d 46 (1st Cir. 1998), is instructive.  <u>Theriault</u> addressed a challenge under Title II of the ADA to the New Hampshire Department of Motor Vehicles's decision to require an individual with cerebral palsy (who operated his car through hand controls but whose hands were visibly shaking when he went to renew his driver's license) to take an additional road test. <u>Id.</u> at 47. He passed that test, and was issued a renewal license. <u>Id.</u>  We concluded that the ADA's demand for "meaningful access" was "not directly at issue" "as it [could not] reasonably be argued that Theriault was denied 'meaningful access' to a government benefit or program" because he received a

license and New Hampshire did not prohibit him from doing so.  Id. at 48. Instead, we noted, Theriault's claim challenged "the method used to determine access to the government benefit, and his contention is that the extra eligibility requirement imposed upon him . . . constituted discrimination based on his disability." Id. In determining whether the imposition of an extra test on Theriault as a condition to renewing a driver's license constituted unlawful discrimination, the court focused on "the state's obligation in balancing the rights of the disabled with the responsibility to ensure safety on the roads." Id. at 49.  Writing for the majority, Judge Coffin reasoned that when symptoms of a disability "concededly and objectively raise a concern about qualifications . . . the public entity may engage in individualized inquiry into whether the person is nonetheless qualified without shouldering the burden of defending its 'discrimination' as 'necessary'." Id. at 50.  In response to Theriault's argument that the state had other, less burdensome ways of assessing his qualifications to drive, the court pointed to weaknesses in those alternatives, and concluded that the state "cannot be faulted for erring on the side of caution when safety is at issue, providing, of course, that the triggering judgment is based not on stereotypes but on observable, relevant circumstances."  Id.

A similar analysis applies here.  Indeed, it applies a fortiori given that TSA's selection of Ruskai for a standard pat-

down was made with no awareness that she was disabled at all. The aim of the standard pat-down was not to determine whether Ruskai had a disability, but rather to determine whether she carried a weapon. And, for the reasons stated in Part V.A of this opinion, we have found that the selection of a screen designed to detect both metallic and nonmetallic weapons to be reasonable. The aspects of that screen of which Ruskai complains affect persons with and without disabilities alike. And, once TSA determined she carried no weapon, that very determination gained her access through the checkpoint irrespective of any aspects of her disability. Collectively, all of these considerations eliminate the footings upon which a section 504 claim can stand. As Judge Coffin observed in Theriault, "when the safety of the public at large is implicated, public entities must be permitted some latitude in their judgments that individualized assessments of qualifications are necessary." Id.

Ruskai also contends that in order for us to find TSA's use of the standard pat-down permissible as the principal secondary search technique at WTMD sites, we must find the use of that protocol "fundamental" to TSA's program. To that contention, we make two responses.

First, as in Theriault, because Ruskai has not been denied access to any program, etc., one could indeed conclude that the government here need not prove that the alterations to its

search protocols sought by Ruskai would result in a "fundamental change" in the program, or that its chosen approach is "necessary." Reasonableness may well be enough.

Second, even if reasonableness is not enough, what Ruskai seeks would indeed seem to require fundamental alterations to TSA's security program. She can point to no additional reasonable accommodation that TSA could make so as to eliminate the burden of which she complains without adversely affecting TSA's efforts to efficiently deploy its resources to maintain airport security as it transitions to targeting nonmetallic weapons. TSA has been installing AIT scanners at more and more checkpoints. It has ample reason to do so entirely apart from this lawsuit. In the interim, to eliminate the disparate impact of which Ruskai complains, TSA would have to stop searching everyone who triggers an alert at a WTMD--abled and disabled alike--for nonmetallic weapons. Such a change would require TSA to expand rather than reduce the use of HHMDs, reduce the number of persons searched for nonmetallic weapons, and eliminate the benefits in standardization, training, and flexible personnel assignments that are achieved by using the same standard pat-down procedure for WTMD and AIT alerts. Given the extraordinary safety concerns at issue here, we cannot find that TSA's current refusal to implement such significant changes violates the Rehabilitation Act.

Alternatively, Ruskai argues that TSA could establish a

nationwide protocol allowing the display of satisfactory medical documentation to justify refusal of a standard pat-down. TSA's PreCheck program already offers a broader exemption from the standard pat-down, and TSA is expanding that program. In any event, developing a program that would both establish a secure and acceptable form of medical documentation and develop procedures and information systems to confirm the authenticity of such documentation at checkpoints would be a fundamental change in TSA practice that strikes us as not required by reason, and very possibly unwise.

We stress, too, that our judgment regarding TSA's position places great weight on the fact that TSA's current program calls for expanded use of the techniques--AIT scanners and PreCheck--for which Ruskai advocates. In this respect, TSA and Ruskai want the same end result. Much of the air travel system in this country has been converted along these lines, decreasing the likelihood that anyone--including Ruskai--will receive a standard pat-down.

TSA assures us that it will continue to expand its use of the preferred techniques, and the record provides no reason for us to conclude otherwise. It is based on this understanding of TSA's ongoing efforts to streamline its physical search protocols and to reduce its reliance on legacy search technologies and techniques that we are able to conclude that ordering further accommodations

to be made now would require fundamental alterations.

## C.   Failure to Investigate

Ruskai also objects that TSA failed to adequately and timely investigate her complaints. She notes that the APA authorizes this court to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2). Although there can be little dispute that the government's performance in responding to petitioner's complaints was unacceptably dismal, petitioner has made clear that she seeks nothing from this portion of her petition (she affirmatively asks us not to remand for reinvestigation, and only to address her claim on the merits). Faced with the government's objection to her lack of claim for relief, she merely reasserted that the agency action was arbitrary and capricious, but again cited no relief that she seeks. Accordingly, we address this claim no further.

## VI.  Conclusion

For the foregoing reasons, we <u>deny</u> Ruskai's petition asking that we set aside the decision of the Transportation Security Administration.